UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHEMBULK HOUSTON PTE. LTD, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-15-714 |
| | § | |
| M/V MONTE ALEGRE, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Chembulk Houston Pte. Ltd. and Chembulk Managment, LLC ("Chembulk Interests") sued defendants M/V MONTE ALEGRE, Monte Alegre GmbH & Co. KG, Columbus Shipmanagement GmbH, and Countainerschiffsreederei MS Monte Alegre GmbH & Co. KG ("Monte Alegre Interests") for monetary relief resulting from a collision between the MONTE ALEGRE and M/T CHEMBULK HOUSTON. Dkts. 1, 2. The Monte Alegre Interests counterclaimed, alleging that the CHEMBULK HOUSTON was at fault. *See* Dkt. 31. The court conducted a non-jury trial in this matter from April 23–26, 2018. Dkts. 58, 60, 62, 66. The court has considered the evidence, arguments of counsel presented at trial, and applicable law and now enters the following findings of fact and conclusions of law.[1]

---

[1] Any finding of fact that should be construed as a conclusion of law is adopted as such, and any conclusion of law that should be construed as a finding of fact is adopted as such.

## I. Findings of Fact

From a preponderance of the evidence, the court finds as follows:

1. At approximately 1334 hours[2] on March 5, 2015, the CHEMBULK HOUSTON (IMO No. 9285469) and MONTE ALEGRE (IMO No. 9348065) collided in the Houston Ship Channel ("Channel") between channel buoys 37/38 and 39/40. *See* Captain Travis Parker Testimony ("Parker Testimony"); *see also* Captain David Rodrigues Testimony ("Rodrigues Testimony").

2. At the time of the incident, the CHEMBULK HOUSTON's registered owner was Chembulk Houston Pte. Ltd. and the CHEMBULK HOUSTON's ship manager was Chembulk Management, LLC. *See* Joint Trial Exhibit ("JTE") 26.

3. The CHEMBULK HOUSTON is a 9,230 gross ton chemical tanker measuring 135.53 meters long by 22.53 meters wide. *Id.*

4. At the time of the incident, the MONTE ALEGRE's owner was Countainerschiffsreederei MS Monte Alegre GmbH & Co. KG and the MONTE ALEGRE's ship manager was Columbus Shipmanagement GmbH. Dkt. 31 at 19.

5. The MONTE ALEGRE is a 69,132 gross ton container ship measuring 272.05 meters long by 40.06 meters wide. JTE 8.

6. The MONTE ALEGRE was on an inbound transit to Barbours Cut Container Terminal. Houston Pilot Captain David Rodrigues was the mandatory pilot on the MONTE ALEGRE throughout the inbound voyage in question. *See* Parker Testimony; Rodrigues Testimony.

---

[2] The court will denote all times in local time. Some of the recorded electronic data, such as the vessels' voyage data recorders ("VDRs"), are in Coordinated Universal Time ("UTC") time, which was six hours ahead of local time.

7.      The CHEMBULK HOUSTON was on an inbound transit to the Stolthaven Terminal in Houston, which is beyond Barbours Cut Container Terminal.  Houston Pilot Captain Travis Parker was the mandatory pilot on the CHEMBULK HOUSTON throughout the inbound voyage in question.  *See* Parker Testimony.

8.      Rodrigues boarded the MONTE ALEGRE at 1142 hours.  He and the vessel's Master, Captain Tomasz Wlodarczyk, conducted a Master-Pilot exchange, and Rodrigues signed the Pilot Card.  *See* JTE 8, 20; Rodrigues Testimony.

9.      Parker boarded the CHEMBULK HOUSTON at approximately 1150 hours.  He and the vessel's Master, Captain Shashank Sharma, conducted a Master-Pilot exchange, and Parker signed the Pilot Card.  The CHEMBULK HOUSTON was roughly 1.5 nautical miles astern the MONTE ALEGRE.  *See* JTE 28; *see also* Parker Testimony.

10.     Each pilot had a portable pilot unit ("PPU"), also referred to as a Raven unit.  This device provided relevant information to each pilot, in addition to the navigational equipment on the ship. The PPU provided: (1) the ship's position; (2) the location of the ship on the Channel; (3) the distance from the centerline of the Channel to the centerline of the ship; (4) vessel speed; and (5) the rate turn of the ship.  The PPU plugged into the ship's automated identification system so that the PPU could receive information from, and provide it to, other ships.  Thus, Parker's PPU received information from the MONTE ALEGRE, and Rodrigues's PPU received information from the CHEMBULK HOUSTON. Both PPUs received information on the other ship's speed and location. Parker Testimony; Rodrigues Testimony; JTE 21, 37.

11.     On March 5, 2015, the Channel reopened after a fog-related closure.  Because of the closure, there was a backlog of vessels waiting to transit the Channel, primarily inbound.  This backlog

created tug availability issues. Rodrigues did not learn of the availability issue until after the MONTE ALEGRE's inbound voyage had begun. Parker Testimony; Rodrigues Testimony.

12. Parker learned from the tug dispatcher that the MONTE ALEGRE's tugboats would be delayed and that the MONTE ALEGRE intended to slow down. *See* Parker Testimony.

13. At about 1250 hours, Parker and Rodrigues agreed that the CHEMBULK HOUSTON would overtake the MONTE ALEGRE with the CHEMBULK HOUSTON passing on the MONTE ALEGRE's port side. Parker and Rodrigues agreed that the overtaking would take place around buoys 29/30 and 31/32.[3] *See* Parker Testimony; *see also* Rodrigues Testimony; JTE 18, 45.

14. Parker asked Sharma to increase the CHEMBULK HOUSTON's engine above its navigational full ahead—known as "ten minute notice." On the CHEMBULK HOUSTON, this "ten minute notice" means ten revolutions per minute ("RPM") above the 125 RPMs of maneuvering full ahead. Because it requires the engine to go above the main engine's maneuvering full ahead command, it takes the engine more time to reach the additional ten RPMs, usually about ten minutes. *See* Parker Testimony; JTE 45.

15. At 1310 hours, Parker radioed Rodrigues stating "here I come" to indicate that he was initiating the overtaking maneuver. The CHEMBULK HOUSTON was 0.4 nautical miles behind the MONTE ALEGRE. The MONTE ALEGRE's engine was on slow ahead and the ship was transiting at 6.7 knots. The CHEMBULK HOUSTON was transiting at 10.1 knots. Parker wanted the speed differential between the vessels to be about 3 knots during the overtaking. JTE 18, 45, 21, 37; Parker Testimony.

---

[3]The parties contest whether Parker or Rodrigues suggested the location of the overtaking. However, the court finds that fact irrelevant. Parker, Rodrigues, Sharma, and Wlodarczyk all admitted that they have no criticism of where the overtaking took place.

16. At 1314 hours, the CHEMBULK HOUSTON moved over to the point where the ship was 203 feet left of center of the Channel, approaching buoys 29/30. Parker wanted the CHEMBULK HOUSTON to be 200 feet left of center of the Channel during the overtaking process. At that time, the CHEMBULK HOUSTON was transiting at 10.4 knots and the MONTE ALEGRE was transiting at 7.0 knots. JTE 21; Parker Testimony.

17. At 1316:27 hours, Rodrigues ordered half ahead on the engine. Up to this point, the overtaking was proceeding without any issue. The CHEMBULK HOUSTON was transiting at 11.0 knots and the MONTE ALEGRE was transiting at 6.8 knots. The CHEMBULK HOUSTON had moved toward the center of the Channel and was 177 feet left of center. The increase in engine order by the MONTE ALEGRE was not communicated to the CHEMBULK HOUSTON. JTE 18, 21; Parker Testimony.

18. Over two minutes later, at 1318:35 hours, Rodrigues ordered the engine back down to slow ahead. Rodrigues gave this order right after Parker informed him that the CHEMBULK HOUSTON was "losing speed all the time." JTE 18.

19. From 1316:27–1318:59 hours, the MONTE ALEGRE VDR indicates that the MONTE ALEGRE increased its speed by 1.2 knots, from 6.9 knots to 8.1 knots.[4] JTE 20.

20. After Rodrigues increased the MONTE ALEGRE's engine, Parker did not maintain his desired location of 200 feet left of center of the Channel. From 1316:27–1318:10 hours, the CHEMBULK HOUSTON went from 177 feet left of center to 264 feet left of center. Parker allowed

---

[4] Parker's PPU, Rodrigues's PPU, and the MONTE ALEGRE VDR provide inconsistent data. Rodrigues's PPU indicates the biggest increase in speed from 6.7–8.7 knots. Also, Parker's PPU and the MONTE ALEGRE VDR indicate a slight decrease in speed immediately following the half-ahead order. Despite those discrepancies, all of the data sources show an overall increase by at least 1.2 knots. JTE 20, 21, 37.

his ship to get pushed too far into the green (left) side of the Channel, where the ship then became subject to environmental factors such as northerly wind, ebb tide, decreased under keel clearance, and bank effect. Parker also used multiple rudder commands causing the use of significant rudder that negatively impacted his ship's speed. These actions contributed to the CHEMBULK HOUSTON's decrease in speed from 11.0 knots to about 9.0 knots at 1316:27–1318:35 hours despite the fact that the ship's engine remained on "ten minute notice." JTE 21, 37, 45; *see* Prentice Strong Testimony ("Strong Testimony"); *see* Eugene Miller Testimony ("Miller Testimony").

21.  At 1318:49 hours, Parker told Rodrigues that he would "keep digging," but warned that he may have to "get back over and drop back." At 1319:02 hours, Rodrigues ordered the engine down to dead slow ahead. JTE 18.

22.  Around 1320:23 hours, Parker asked Rodrigues if he should "drop back" because he was continuing to lose speed. Rodrigues advised Parker that he should. At that point, the MONTE ALEGRE was transiting faster than the CHEMBULK HOUSTON. JTE 21, 37, 45.

23.  After Parker and Rodrigues made their new agreement, Rodrigues increased the engine to slow ahead (1320:35 hours), half ahead (1320:44 hours), and full ahead (1321:46 hours). Meanwhile, Parker decreased the CHEMBULK HOUSTON to maneuvering speed (1320:39) and eventually half ahead (1325:34 hours). JTE 18, 45.

24.  Due to the hydrodynamic forces from the MONTE ALEGRE, the CHEMBULK HOUSTON increased in speed even though Parker reduced the engine order. At 1320:39 hours, the CHEMBULK HOUSTON was transiting at 7.8 knots. The vessel's speed reduced to 7.0 knots at

1322:56 hours, but quickly increased to 11.0 knots by 1325:34 hours despite no increase in the engine order.[5] Then, Parker reduced the engine to half ahead. JTE 21, 45.

25. At 1328:27 hours, the CHEMBULK HOUSTON had slowed to about 9.7 knots. Parker again tried to slow the ship by ordering slow ahead. At 1330:31 hours, the CHEMBULK HOUSTON had slowed to about 9.4 knots. Parker then ordered dead slow ahead. However, the CHEMBULK HOUSTON actually increased speed after the engine were reduced to dead slow ahead. JTE 21, 37, 45.

26. Parker tried several different maneuvers to drop back. First, he tried to reduce the CHEMBULK HOUSTON's speed. Parker tried "running through the bells, trying to decrease whenever [he could]" through "a lot of engine orders [and] a lot of rudder." However, Parker was unable to reduce the vessel's speed. *See* Parker Testimony.

27. Second, Rodrigues recommended that Parker try to "drive [the CHEMBULK HOUSTON] out of the channel." Parker agreed and tried to drive the vessel into the mud at least twice, or ground it on the green side of the Channel. However, both times the vessel sheered off the bank toward the MONTE ALEGRE. Both times Parker was able to re-gain control of the vessel to avoid a collision. JTE 45; Parker Testimony.

28. Parker then tried to grind the vessel up against the green side bank. However, his attempt resulted in the vessel sheering "violently" to starboard. Parker warned Rodrigues that the CHEMBULK HOUSTON was swinging wildly toward the MONTE ALEGRE. Despite attempts

---

[5]Rodrigues's PPU indicated that the CHEMBULK HOUSTON was transiting at 7.2 knots at 1322:56 hours and 10.5 knots at 1325:34. JTE 37. Despite this discrepancy, it is clear that the CHEMBULK HOUSTON increased speed despite no change in engine orders.

by Parker and Rodrigues, neither vessel changed its trajectory and the CHEMBULK HOUSTON collided with the MONTE ALEGRE at 1334 hours. Parker Testimony; JTE 45.

29. As stipulated by the parties, as a direct and proximate result of the collision, the Chembulk Interests have sustained recoverable damages in the amount of $1,651,249.82, and the Monte Alegre Interests have sustained recoverable damages in the amount of $5,310,469.19. Dkt. 31 at 20.

30. The Pilot Board Investigation and Recommendation Committee conducted an investigation Parker's and Rodrigues's actions. After reviewing and accepting the findings of the Pilot Board, the Board of Pilot Commissioners for Harris County Ports found that Rodrigues erred in judgment, but the error did not rise to the level of willful misconduct. Rodrigues was cautioned "with regard to [his] actions by keeping the speed of the M/V MONTE ALEGRE at half ahead for more than necessary to 'check her up,' thereby adversely affecting the overtaking M/T CHEMBULK HOUSTON."[6] *See* CHEMBULK HOUSTON Exhibit 1, 2.

31. Once Parker and Rodrigues agreed that the CHEMBULK HOUSTON would fall back behind the MONTE ALEGRE, both pilots acted reasonably under the circumstances. Rodrigues increased the speed of the MONTE ALEGRE from approximately 8.3 knots, when the parties made the new agreement, to about 9.8 knots just before the collision. Parker attempted to decrease the speed of the CHEMBULK HOUSTON, but was unable to decrease enough speed to drop behind the MONTE ALEGRE due to the hydrodynamic forces from the MONTE ALEGRE. JTE 21, 37; *see* Parker Testimony; *see* Paraskevas Mangriotis Testimony ("Mangriotis Testimony"); *see also* Erland Wilske Testimony ("Wilske Testimony").

---

[6]The court considered the finding of the Board of Pilot Commissioners, but was not compelled to follow its finding.

32. Given the speed of the CHEMBULK HOUSTON, dropping an anchor was not a viable option for Parker. *See* Parker Testimony; *see also* David Scruton Testimony ("Scruton Testimony").

33. Given the state of emergency,[7] Parker acted reasonably in attempting to run the CHEMBULK HOUSTON into the mud on the green side of the Channel. Indeed, Rodrigues even recommended that course of action. *See* Parker Testimony; JTE 45.

34. However, the MONTE ALEGRE did not maintain its course and speed during the overtaking. The MONTE ALEGRE's increase in speed, in part, prevented the overtaking from being fully completed. JTE 21, 37; Parker Testimony; Wilske Testimony;[8] Scruton Testimony; Mangriotis Testimony.

35. The MONTE ALEGRE cannot show that the increase in speed was not the cause of the collision. Eugene Miller, the MONTE ALEGRE's hydrodynamic expert, testified on this point. Miller was asked if "the increase in speed of the MONTE ALEGRE had no effect on the unsuccessful overtaking." He testified that he could not say that. *See* Miller Testimony.

36. Parker failed to exercise prudent seamanship and reasonable care when he allowed the CHEMBULK HOUSTON to traverse further outside the Channel than he intended during the initial overtaking. Parker's actions contributed to the CHEMBULK HOUSTON's decrease in speed. *See* Rodrigues Testimony; *see* Strong Testimony; *see also* Miller Testimony.

---

[7]As illustrated below, the CHEMBULK HOUSTON was not *in extremis*. *See infra* Section II.9. Nonetheless, a compulsory pilot is held to the standard of a competent compulsory pilot in the same circumstances. *Kingfisher Shipping Co. v. M/V Klarendon*, 651 F. Supp. 204, 207 (S.D. Tex. 1986). The court finds that a competent compulsory pilot would have taken the same actions as Parker in the same circumstances.

[8]The court was not persuaded by the overall conclusion of the SSPA simulation. However, the simulation, along with testimony from Wilske and Mangriotis, provided evidence that the MONTE ALEGRE's increase in speed contributed to the collision.

37. The MONTE ALEGRE's increase in speed was the primary cause of the collision, but the CHEMBULK HOUSTON's decrease in speed due to Parker's actions also contributed to cause the collision.

38. The court finds the MONTE ALEGRE 85% at fault, and the CHEMBULK HOUSTON 15% at fault.

## II. CONCLUSIONS OF LAW

1. This is a case of admiralty and maritime jurisdiction, as well as an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. 28 U.S.C. § 1333; Fed. R. Civ. P. 9(h).

2. A vessel (as an independent entity in maritime law) in the hands of a compulsory pilot is liable *in rem* for the negligence of the pilot. *Kim Crest, S.A. v. M.V. Sverdlovsk*, 753 F.Supp. 642, 649 (S.D. Tex. 1990).

3. Maritime collision liability is predicated upon fault, which means negligence. *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000). To establish maritime negligence, a plaintiff must "demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury." *Id.* (citation omitted).

4. "The applicable standards of care in a collision case stem from the traditional concepts of prudent seamanship and reasonable care, statutory and regulatory rules, and recognized customs and usages." *Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2006).

5. "A compulsory pilot's decisions are not negligent if they are the decisions a competent compulsory pilot might reasonably have made under the same circumstances; thus, due care and skill is required of a compulsory pilot but not infallibility." *Kingfisher*, 651 F. Supp. at 207.

6. For causation, "fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." *Inter-Cities Navigation Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979) (citation omitted). "To give rise to liability, a culpable act or omission must have been 'a substantial and material factor causing the collision.'" *Am. River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 450 (5th Cir. 1998) (quoting *Inter-Cities*, 608 F.2d at 1081).

7. "Establishing liability in a collision case is eased by the *Pennsylvania* rule, which provides that when a vessel is in violation of a statutory duty, the burden is on the offending vessel to prove that its conduct did not and could not have caused the collision." *Stolt*, 447 F.3d at 364; *see also The Pa.*, 86 U.S. 125, 136 (1873). "If [the violating party] is to escape liability for the loss, it must prove not just that its violation probably was not, but in fact could not have been a cause of the collision." *Pennzoil Prod. Co. v. Offshore Express, Inc.*, 943 F.3d 1465, 1472 (5th Cir. 1991). "Although application of the rule imposes a heavy burden of proof, that is all that it does. It does *not* determine a party's ultimate share of liability for a loss." *Id.*

8. In maritime collision cases, the doctrine of comparative fault governs the apportionment of fault and allocation of damages. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S. Ct. 1708 (1975).

9. "Where, without prior negligence, a vessel is put in the very center of destructive natural forces and a hard choice between competing courses must immediately be made, the law requires

that there by something more than mere mistake of judgment by the master in that decision *in extremis*." *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 84 (5th Cir. 1960). "The party relying on the *in extremis* doctrine must be completely free from fault prior to the emergency occurrence." *City of Chicago v. M/V Morgan*, 375 F.3d 563, 577 (7th Cir. 2004) (citing *P.R. Ports Auth. v. M/V Manhattan Prince*, 897 F.2d 1, 6 (1st Cir. 1990)). Here, the CHEMBULK HOUSTON was not free from fault before the emergency occurrence. Parker contributed to the emergency occurrence by making maneuvers that decreased the speed of his vessel. Thus, the *in extremis* doctrine does not shield the CHEMBULK HOUSTON. However, the court recognizes the emergency nature of the situation after Parker and Rodrigues made the new agreement. Given that nature, Parker's actions were in accordance with what a reasonable compulsory pilot would do under the same circumstances. *See Kingfisher*, 651 F. Supp. at 207; *see supra* Section I.33.

10. The Inland Navigation Rules apply to this area of the Channel where the collision occurred. While all the Rules apply to vessels underway, Rules 13(a) and (d), 16, and 17 are the most applicable to this overtaking, although Rules 2(b) and 9(a)(i) have application. These Rules state in pertinent part:

> **Rule 13—Overtaking**
> (a) Notwithstanding anything contained in Rules 4 through 18 (§§ 83.04 through 83.18), any vessel overtaking any other shall keep out of the way of the vessel being overtaken.
> . . . .
> (d) Any subsequent alteration of the bearing between the two vessels shall not . . . relieve her of the duty of keeping clear of the overtaken vessel until she is finally past and clear.
> **Rule 16—Action by give-way vessel**
> Every vessel which is directed to keep out of the way of another vessel shall, so far as possible, take early and substantial action to keep well clear.
> **Rule 17—Action by stand-on vessel**
> (a)(i) Where one of two vessels is to keep out of the way, the other shall keep her course and speed.

> . . . .
> (d) This Rule does not relieve the give-way vessel of her obligation to keep out of the way.
> **Rule 2—Responsibility**
> (b) In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.
> **Rule 9—Narrow channels**
> (a)(i) a vessel proceeding along the course of a narrow channel or fairway shall keep as near to the outer limit of the channel or fairway which lies on her starboard side as is safe and practicable.

33 C.F.R. §§ 83.13, 83.16, 83.17, 83.02, 83.09.

11. The MONTE ALEGRE violated Rule 17 by failing to keep her speed. That violation implicates the *Pennsylvania* rule. Thus, the MONTE ALEGRE must prove that the violation did not, and could not, cause the collision. *Pennzoil Prod.*, 943 F.3d at 1472. The MONTE ALEGRE did not prove that, and even admitted that it could not. *See supra* Section I.35. Accordingly, the MONTE ALEGRE is at fault for increasing its speed during the overtaking. *Pennzoil Prod.*, 943 F.3d at 1472.

12. The CHEMBULK HOUSTON failed to exercise prudent seamanship and reasonable care by traversing too far into the green side of the Channel. The CHEMBULK HOUSTON took unnecessary action that contributed to its decrease in speed. Because the increase in speed by the MONTE ALEGRE combined with the decrease in speed by the CHEMBULK HOUSTON caused the collision, the CHEMBULK HOUSTON is also at fault. *Reliable Transfer*, 421 U.S. at 411.

13. The parties have stipulated to the recoverable damages available and sustained as a direct and proximate result of the collision. Dkt. 31 at 20; *see supra* Section I.29.

14. Because the MONTE ALEGRE is 85% responsible for the collision, as outlined above, the Chembulk Interests are entitled to recover 85% of their agreed, recoverable damages, which are

$1,651,249.82. Multiplying that by 0.85 equals $1,403,562.35. Because the CHEMBULK HOUSTON is 15% responsible for the collision, the Monte Alegre Interests are entitled to recover 15% of their agreed, recoverable damages, which are $5,310,469.19. Multiplying that by 0.15 equals $796,570.38. Thus, the Chembulk Interests are ultimately entitled to recover $606,991.97 from the MONTE ALEGRE, *in rem*, plus prejudgment interest from the date of the incident, post-judgment interest, and costs of court. *See Ryan Walsh Stevedoring Co. v. James Marine Servs., Inc.*, 792 F.2d 489, 492 (5th Cir. 1986) ("[A]n award for prejudgment interest in actions under the general maritime law is the rule rather than the exception; prejudgment interest must be awarded unless unusual circumstances make an award inequitable."); 28 U.S.C. § 1961(a) (providing post-judgment interest); Fed. R. Civ. P. 54(d) (providing costs to prevailing party).

15. The court will assess prejudgment interest at the legal rate established under 28 U.S.C. § 1961. *See In re M/V Nicole Trahan*, 10 F.3d 1190, 1196–97 (5th Cir. 1994) (affirming award of prejudgment interest at federal rate when there was no evidence to support a different rate). The current interest rate under § 1961 is 2.23% per annum.

### III. CONCLUSION

Having considered the evidence, arguments of counsel at trial, and applicable law, the court finds the MONTE ALEGRE 85% responsible for the collision and the CHEMBULK HOUSTON 15% responsible for the collision. Accordingly, the Chembulk Interests are entitled to recover from the Monte Alegre Interests the following:

    (1)    damages in the amount of $606,991.97;

    (2)    prejudgment interest at 2.23% per annum from and after March 5, 2015, until entry of judgment;

(3) post-judgment interest at 2.23% per annum from entry of judgment until paid;

and

(4) all costs of court as provided by law.

The court will enter a final judgment consistent with these findings of fact and conclusions of law.

Signed at Houston, Texas on June 7, 2018.

_____
Gray H. Miller
United States District Judge